UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

        Plaintiff,                Criminal No.  15-20462

v.                               Hon. David M. Lawson

Curtis Lee Williams,

        Defendant.

_____/

### United States' Response Opposing
### the Defendant's Motion for Compassionate Release

Curtis Williams is a serial bank robber. On February 17, 2015, law enforcement arrested the 62 year old Williams after he robbed a bank with what turned out to be a toy gun. After his arrest he admitted to robbing four more banks between December 2014 and February 2015. The Court sentenced Williams to 120 months in prison. Williams robbed these banks after being sentenced to more than 16 years in prison for committing 12 bank robberies in 1992-1993.

Williams began serving his sentence on March 15, 2016, though he received credit for his pretrial detention. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A) citing two separate grounds: his family circumstances and Covid-19. His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities.

Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of June 3, 2020, these directives have resulted in at least 3,610 inmates being placed on home confinement. *See* BOP Covid-19 Website.

*Second*, Williams does not qualify for compassionate release. While Williams sought compassionate release from the BOP based on his family circumstances (though he did so after he filed his initial motion (ECF 49, Compassionate Release Motion, and ECF 54, Def. Suppl Brf, at 26)), he has not sought compassionate release based on Covid-19, as is mandatory under 18 U.S.C. § 3582(c)(1)(A). As a result, the Court cannot address his Covid-19-based argument until he exhausts his administrative remedies.

Nor, in any event, does Williams satisfy the statutorily mandated criteria for compassionate release. His family circumstances are not "extraordinary and compelling" reasons for release. Moreover, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Williams's failure to meet the criteria in USSG § 1B1.13 also forecloses relief. Williams's offense and criminal history make him a danger to the community, which precludes release under USSG

§ 1B1.13(2). Williams has twice gone on bank robbery sprees during which he used a real or fake gun to threaten bank employees or customers, and he has committed other crimes. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release for the same reasons.

### Background

In late 2014 to 2015, Williams robbed five banks with what turned out to be a toy gun. He was 62 years old. During the first robbery, Williams grabbed a customer by the arm and pointed what appeared to be a handgun toward the customer's head and neck area, ordered customers to the floor, and fled with about $9,000.

During the second robbery, Williams approached a teller where a customer was being served, wrapped his arms around the customer and, while holding the customer, revealed what appeared to be a pistol. He fled with about $3,000.

During the third robbery, Williams pushed his way through two customers, demanded money from a teller while showing the teller what appeared to be a pistol, and fled with about $2,000.

During the fourth robbery, Williams went to a teller window, pushed the back of the head of a customer, ordered the customer to get down, pointed what appeared to be a pistol at the customer's face, demanded money from the teller, and then pointed the gun at the teller. He fled with about $1,000.

During the fifth robbery, Williams approached a customer and teller, put his hands on the customer, stated he had a gun, and showed what appeared to be gun to

3

the teller. This time, a customer nearby noticed Williams's gun was a toy and intervened. They fell to the ground, but Williams was able to get away with some of the money. He fled in his vehicle, but was pulled over and arrested soon thereafter.

Williams pleaded guilty to one robbery, and agreed to be held accountable for four more. The Court sentenced Williams to 120 months and supervised release.

Williams did all of this after serving about 16 years in federal prison for robbing 12 banks in 1992-93. *United States v. Williams*, No. 93-80062 (E.D. Mich.). During those robberies Williams used a real firearm, which led to additional charges and a 18 U.S.C. § 924(c) conviction. (PSR at ¶ 73). Williams also convictions for larceny, assault and battery, and carrying a concealed weapon. (PSR at ¶¶ 71-72, 74-75).

Williams began serving his current prison sentence on March 15, 2016. He is incarcerated at FCI Gilmer, a medium security institution. He is 67 years old and his projected release date is September 2023. He does not report, and the government is unaware of, any underlying medical conditions. Nevertheless, Williams has moved for compassionate release, citing his "family circumstances" and his age in light of the Covid-19 pandemic. While he submitted a request for compassionate release to the warden based on family circumstances in February (after filing his pro se motion on that ground), he has not made a request based on the Covid-19 pandemic.

**Argument**

**I.    The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

**A.    The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the BOP began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the crisis has evolved, the BOP has repeatedly revised its plan. To stop the spread of the disease, the BOP has restricted inmate movement within and between facilities. *See id.* Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are also issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation.

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's

5

criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the BOP has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

### B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation temporarily permits the BOP to "lengthen the maximum amount of time for which [it] is

authorized to place a prisoner in home confinement" during the Covid-19 pandemic. CARES Act § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the BOP to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the BOP to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The BOP's efforts on this point are not hypothetical. Over 3,610 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

1.) Each inmate's age and vulnerability to Covid-19;

2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The BOP cannot open its facilities'

gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or commits a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The BOP's home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The BOP must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those, like Williams, who have been convicted of serious offenses or have a lengthy criminal record—have already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. And if a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the BOP's home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the BOP must first ensure that his proposed home-confinement location is suitable for release, does not

place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation and the probation department's reduced ability to supervise released inmates. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the BOP to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b); *United States v. Patino*, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020). It is especially true now, given the BOP's substantial and ongoing efforts to address the Covid-19 pandemic.

## II.    The Court should deny Williams's motion for compassionate release.

Williams's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Instead, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request, and he cannot raise a different ground than the one he raised during the administrative process. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, No. 20-1298, __ F.3d __, 2020 WL 2845694 (6th Cir. June 2, 2020). Because this requirement is a statutory one and not judicially crafted, it is mandatory. *Id.*

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require

10

the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. The Court is barred from granting release because Williams has not exhausted his administrative remedies based on Covid-19.

The government recognizes that the Court held in *United States v. Flenory*, No. 05-80955, 2020 WL 2124618, at *4-5 (E.D. Mich. May 5, 2020), that § 3582(c)(1)(A)'s exhaustion requirement does not deprive it of jurisdiction and can be waived in some circumstances during the Covid-19 pandemic. The government is nonetheless making its contrary argument that exhaustion remains mandatory, particularly in light of the Sixth Circuit's opinion yesterday in *United States v. Alam*, finding that exhaustion is mandatory before filing a compassionate release motion.

The Court should dismiss that part of Williams's motion based on the Covid-19 pandemic because he has not satisfied the exhaustion requirement on that ground under 18 U.S.C. § 3582(c)(1)(A). Until recently, only the BOP could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id.* A district court may not grant a defendant's motion for

compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *Alam*, 2020 WL 2845694, at *1.

Statutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016). The Sixth Circuit confirmed that *Ross* applied to § 3582(c)(1)(A) yesterday in *United States v. Alam*.

In *Alam*, the defendant submitted a request to the warden for release, but did not wait 30 days for a response, and instead filed a motion in Court 10 days later. *Alam*, 2020 WL 2845694, *1. Citing *Ross*, the *Alam* court held that courts cannot "create a 'special circumstances' exception" to the exhaustion requirement because Congress created it, the "judiciary has a role to play in exception-crafting 'only if Congress wants [it] to,'" and "[n]othing in § 3582(c)(1)(A) suggests the possibility of judge-made exceptions." *Id.* at *3 citing *Ross*, 136 S. Ct. at 1856–57. Even though the 30-day time period had since passed, *Alam* rejected defendant's many attempts to carve out some equitable exception to the "mandatory" requirement. *Id*. at *3-4; *see also Raia*, 954 F.3d at 595-97 (Covid-19 pandemic does not permit inmates or district judges to bypass § 3582(c)(1)(A)'s exhaustion requirement).

Those requirements also mean that an inmate may not seek compassionate release here on a different ground than the one he raised during the administrative process.

12

The whole point of § 3582(c)(1)(A)'s exhaustion requirement is to ensure that the BOP has the opportunity to evaluate and consider an inmate's request first, while allowing the inmate to seek relief in court if the BOP denies or fails to act upon the request. So an inmate's pre-pandemic request for compassionate release—which "did not mention [the] Covid-19 concerns" that "are central to this [most recent] motion"—does not satisfy § 3582(c)(1)(A)'s requirements, because "[p]roper exhaustion necessarily requires the inmate to present the same factual basis for the compassionate-release request to the warden." *United States v. Mogavero*, No. 15-00074, 2020 WL 1853754, at *2 (D. Nev. Apr. 13, 2020).

Here, Williams acknowledges that he did not raise Covid-19 in his February 2020 request to the warden, and he does not claim that he made an additional Covid-19-based request to the warden for compassionate release in March, April, or even May 2020. (ECF 54, Def. Suppl Brf, at 13-14). He says that does not matter, however, because § 3582(c)(1)(A) does not require "issue exhaustion," and courts always can consider new, updated medical information under § 3553(a).

If his initial request had been based on his own rather than his sisters' health, Williams would be right that the Court could consider more recent medical records. But Williams is seeking compassionate release on a completely new ground – Covid-19 – that he has not raised in a request to the warden that would have triggered the 30 day time period. Williams has therefore not satisfied § 3582(c)(1)(A)'s mandatory exhaustion requirement with respect to his Covid-19 basis for release.

**B.    There are no extraordinary and compelling reasons to grant Williams compassionate release.**

Williams seeks compassionate release on two grounds: "family circumstances" and the Covid-19 pandemic. Even if Williams had exhausted his administrative remedies on all asserted grounds, compassionate release would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

1. Williams's family circumstances are not extraordinary and compelling reasons to grant him compassionate release

Williams does not specify under what subpart of § 1B1.13 cmt. n.1 his "family circumstances" argument falls. (ECF 54, at 8-9). That may be because "family circumstances" under subpart (C) is limited to circumstances not present here: "death or incapacitation of the caregiver of the defendant's minor child or minor children" or "incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner."

Williams may invoke subpart (D). But, as mentioned, the First Step Act did not change the substantive requirement that a sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission. 18 U.S.C. §

3582(c)(1)(A). Nor did Congress remove the directive that the Commission, not the judiciary, adopt policies regarding "what should be considered extraordinary and compelling reasons for sentence reduction." 28 U.S.C. § 994(a)(2)(C) & (t). Thus, subpart (D) remains limited to "an extraordinary and compelling reason" that is articulated by the BOP in Program Statement 5050.50, that are slightly different from and more extensive than the first three categories in § 1B1.13, but nonetheless tied to them. *United States v. Lynn*, 2019 WL 3805349 (S.D. Ala. Oct. 8, 2019); *United States v. Fox*, 2019 WL 3046086, at * 3 (D. Me. July 11, 2019). The Program Statement does not allow for compassionate release for Williams's family circumstances.

Some district courts have disagreed and held that Program Statement 5050.50 does not constrain the court's authority to grant relief under USSG § 1B1.13 cmt. n. 1(D), but they have done so by not following the statutory text. *See, e.g., United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020). Many courts have adhered to the statutory text to conclude that the Commission's policies remain controlling. *See Saldana*, 2020 WL 1486892, at *3; *Lynn*, *2019* WL 3805349, at *3; *United States v. Strain*, 2020 WL 1977114, at *3-5 (D. Alaska, April 24, 2020).

Even if the Court finds that it has the authority to grant relief under subpart (D), the Court should decline to do so because Williams does not have "extraordinary and compelling reasons" for release. One district court recently looked to the dictionary for guidance on the meaning of that phrase:

16

> "Extraordinary" is defined as "exceptional to a very marked extent." *Extraordinary*, Webster's Third International Dictionary, Unabridged (2020). "Compelling" is defined as "tending to convince or convert by or as if by forcefulness of evidence." *Compelling*, Webster's Third International Dictionary, Unabridged (2020).

*United States v. Shah*, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020).

Another court described the requirements of "'extraordinary' as beyond what is usual, customary, regular, or common," and "'compelling reason' as one so great that irreparable harm or injustice would result if the relief is not granted." *United States v. Sapp*, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31, 2020) (citation omitted).

Williams cannot meet this standard. In a pro se filing Williams cited his daughter's murder in 2007, his son's suicide around the same time, and his two older sisters with health problems who need assistance. (ECF 49, Compassionate Release Motion, at 1-2). Williams then sought an adjournment so that his new attorney could submit information regarding his sisters' health. Williams filed a supplemental brief with a letter from his sister, Brenda Alexander, who reported that Williams has four sisters and a brother in law with the following medical histories:

- Brenda (80): prior hip replacement and kidney removal due to cancer;

- Robert (83): history of a kidney transplant and "other illnesses;"

- Barbara (80): arthritis that requires an infusion to address pain;

- Elsie (79): recovering from bladder cancer; and

- Myra (71): arthritis of the spine, slip disc in her neck, and an unspecified right hand condition.

17

(Def. Suppl Brf, ECF 54 at 8-9 and 54-2).

Williams' son and daughter's deaths in 2007, while tragic, do not qualify.

Nor do his sisters' health conditions. The letter from Brenda Alexander briefly summarizing the four sisters' health issues, some of which may have been treated and resolved, does not provide sufficient detail for the Court to find "extraordinary and compelling reasons" for release. Williams provides no details supported by medical records regarding their specific ongoing health conditions, courses of treatment, or needed assistance. He does not say whether any of their conditions, treatment, or needs are materially different from when he committed the robberies in 2014-15. He does not state where each sister lives (such as an assisted living facility), who is assisting them now, that others are unavailable to assist them, or that their current needs are unmet, all of which is necessary information to evaluate Williams' motion. *Sapp*, 2020 WL 515935, at *3 (denying compassionate release to a defendant whose partner had been diagnosed with an aggressive form of cancer due to unanswered questions about medical needs).

In essence, Williams's argument is that Brenda Alexander "very much would appreciate" Williams's early release "so he could be home to help us." (ECF 54-2, Def. Suppl Brf). Such a letter from his sister, however heartfelt, is not an "extraordinary and compelling reason" justifying release. *Id.*; *see also United States v. Goldber*g, 2020 WL 1853298, at *4 (D.D.C. Apr. 13, 2020) (desire to help care for elderly parents does not qualify); *United States v. Ingram*, 2019 WL 3162305

(S.D. Ohio July 16, 2019) ("Many, if not all inmates, have aging and sick parents" which "is not extraordinary.").

Williams cites *United States v. Walker*, 2019 WL 5268752 (N.D. Ohio Oct. 17, 2019). But Williams is nothing like the defendant in *Walker*, who had served in the military and suffered from undiagnosed PTSD that led to drug abuse and his eventual criminal conduct. *Id*. at 2. *Walker* also had served almost all of his sentence, had a terminally ill mother with documented leukemia who was expected to undergo extensive non-traditional treatment due to a genetic disorder, and had a lucrative job offer that would help cover his mother's medical expenses, among other unique circumstances. *Id*. at 3.

Williams states that if he is not released early, before September 2023, he may never see his sisters again. But nothing in the record projects their life expectancy. Williams's situation is no different from any incarcerated inmate. His desire to see his sisters is understandable, but his inability to do so is a consequence of his actions.

2. Covid-19 does not constitute extraordinary and compelling reasons to grant Williams compassionate release

Similarly, the Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Williams and other inmates. Thus, as the Third Circuit has explained, "the mere existence of Covid-19 in society and the possibility that it may spread to

a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597.

While Williams's age satisfies the requirements for release in USSG § 1B1.13 cmt. n.1 when considered in combination with the Covid-19 pandemic, Williams himself admits that his "health is **NOT** declining." (ECF 49, Compassionate Release Motion, at 2 (emphasis in original)). Williams's prison medical records do not reveal any health conditions related to the Covid-19 risk factors.

Further, although a defendant's heightened risk from Covid-19 in prison might, in some circumstances, satisfy the medical or age criteria in USSG § 1B1.13 cmt. n.1, Williams's circumstances cast doubt on whether that is true here. The *average* person may have a higher relative risk of contracting Covid-19 in prison than if released among the public at large. But § 1B1.13 requires an *individualized* assessment, and an individual defendant's relative risk varies widely. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *4–*5 (E.D. Mich. May 15, 2020). It depends on the precautions at his prison, the number of Covid-19 cases there, whether and how much that number might increase or decrease, the prison's medical facilities, the defendant's release plan, the threat from Covid-19 in his release location, his access to medical care if released, and his willingness to abide by release restrictions and social-distancing protocols. *See id.* While Williams notes that there were five Covid-19 cases at FCI Gilmer as of early May 2020 (ECF 54,

Def. Suppl Brf, at 11), as of June 3, 2020 (more than two weeks later) there have
been only six inmates and no staff who have tested positive, and all of them
recovered, meaning the prison's precautions and medical facilities have responded
well to the situation. BOP Covid-19 Website. In these circumstances, the threat from
Covid-19 in prison cannot be said to be any greater than if he were to return to
Southeast Michigan, where, unlike in prison, it is unknown where exactly Williams
would live or whether he would have access to medical care.

Moreover, given Williams's criminal record, it is at least questionable whether
he would abide by the terms of home confinement—much less adhere to the CDC's
social-distancing protocols or the Governor's stay-at-home order. If he did not, he
would be far more likely than other members of the public to expose himself and
other people to Covid-19.

Finally, even if the combination of Williams's age and the Covid-19 pandemic
satisfied the initial criteria for eligibility in USSG § 1B1.13 cmt. n.1, Williams
would remain ineligible for compassionate release because he is a danger to the
community. Section 1B1.13(2) only permits release if a "defendant is not a danger
to the safety of any other person or to the community, as provided in 18 U.S.C.
§ 3142(g)." It thus prohibits the release of violent offenders, including most drug
dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010). It
also bars the release of many other defendants. An evaluation of dangerousness
under § 3142(g) requires a comprehensive view of community safety—"a broader

construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam).

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Many police departments have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Covid-19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with an influx of convicted defendants.

Because Williams's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). When he was in his 40s Williams robbed 12 banks, each time using a gun. He was sentenced to more than 16 years in prison for the robberies and § 924(c) charge. While that experience taught Williams not to use a real firearm, he did not learn that he should no longer rob banks. Instead, at age 62, he robbed five more banks, each time with a toy gun that qualified as a dangerous weapon. During the robberies he threatened tellers and bank customers. The fact that he brandished a toy, rather than a real gun, provided little comfort to the bank employees and customers who feared for their lives. Robbing five banks while in his 60s undermines any suggestion that he is not a danger to the community despite his age. Williams is not eligible for compassionate release.

### C. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Austin*, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020). So even if the Court were to find Williams eligible for compassionate release, the § 3553(a) factors still disqualify him.

Williams's conduct was an extremely dangerous and serious offense. His conduct triggered guidelines enhancements for using a "dangerous weapon" and "physically restraining" a person during the commission of the offense. (PSR at ¶¶ 25-62). He committed some robberies while on probation. (PSR at ¶ 77). And he committed these robberies at age 62 despite having previously been sentenced to more than 16 years for robbing 12 banks with a guns.

Williams argues that the fact that he has engaged in programming while in prison, "only" has one disciplinary report, and has caring sisters able to support him as he

23

cares for them, counsel in favor of release under § 3553(a). (ECF 54, Def. Suppl Brf at 13). But Williams does not say how these facts apply under § 3553(a). In fact, Williams's progress report only identifies him as having engaged in spin classes and one drug treatment class, all in 2018-19. (ECF 54-3, Def. Suppl Brf, Ex. 2).

The above facts demonstrate why the Court, in applying the § 3553(a) factors and even after considering the government's motion under 5K1.1, sentenced Williams to a guidelines sentence in the first place, and why he should not be released now.

## III. If the Court were to grant Williams's motion, it should order a 14-day quarantine before release.

Williams's motion should be denied. If the Court is inclined to grant Williams's motion, however, it should order a 14-day quarantine before release.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/*Andrew J. Lievense*
Andrew J. Lievense
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9665
andrew.lievense@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 3, 2020. I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification to all counsel of record.

s/*Andrew J. Lievense*
Andrew J. Lievense
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9665
andrew.lievense@usdoj.gov